Related DOJ
FILED

BYRON o. WOODS SR.,
15549 FIREROCK LN
MORENO VALLEY, CA 92555
909-549-6252
caliboy92324@gmail.com

IN PRO PER

2022 APR 22 AM 10: 17

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
RIVERSIDE

BY_____

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

BYRON O. WOODS SR.,

        Plaintiff(s),

vs.

SUPERIOR COURT OF CALIFORNIA,
COUNTY OF LOS ANGELES,

        Defendant(s).

Case No.: CV-22-02685-DOC(AS)

CIVIL RIGHTS COMPLAINT:

42 U.S.C. § 1983: (NON-PRISONER)

Jury Trail Demanded: NO

## I. JURISDICTION

This is an action for damages pursuant to 42 U.S.C. § 1983 based upon the violations of Plaintiffs' rights under the Fifth and Fourteenth Amendments to the United States Constitution. Jurisdiction exists pursuant to 28 U.S.C. § 1331 and 1343 based on 42 U.S.C. §1983 and questions of federal constitutional law.

## II. VENUE

Venue is proper pursuant to 28 U.S.C § 1391 because this section shall govern the venue of all civil actions brought in district courts of the United States.

## III. IDENTIFICATION OF PARTIES

Byron O Woods Sr. (hereinafter "Plaintiff"); Superior Court of California, County of Los Angeles, et al (hereinafter "Defendant'); Sheeri R. Carter, Executive Office/Clerk of Court "Court Clerk" (hereinafter "Defendant').

## IV. STATEMENT OF FACTS

On September 2, 2011, in the City of Long Beach, Ca, the plaintiff was arrested for Driving Under the Influence (DUI). The very next day on September 3, 2011, bail was posted, and he was released. After being released the plaintiff went directly to the bail bond agency where he was provided his statement of charges. In that document it provided the court date that the plaintiff was to be arraigned which was September 14, 2011. After the twelve days, on September 14, 2011, the plaintiff showed up for his arraignment, *People v. Byron Woods,* Superior Court Case No. 1LT01675. However, after the morning and afternoon court session, the plaintiff's name was never called by the defendant. This obviously panicked the plaintiff having never being in this specific situation, so he went directly to the court clerk's office to inquire as to the reason his name was not called. After several minutes, it was explained to him, his name was not called, because as of that time, the prosecutor had not yet filed his case.

By the plaintiff not having been in that situation, he asked the court clerk what was the protocol in this situation? He was informed, the prosecutor had up to a year to file charges, and he had to wait on the prosecutor to decide on whether they were going to file his case or not. After that explanation, he asked the court clerk if he was entitled to documentation attesting to that fact, because he showed up, but his case was not filed. At which time the plaintiff was provided proof of attendance, and once he was given the proof of attendance the plaintiff left the courthouse. After several weeks of no contact from the prosecutor, or the court clerk, on October 5, 2011, the plaintiff received a phone call from Aladdin Bail Bonds stating that, if the plaintiff did not turn himself in, they were going to come to his home and physically arrest him.

Taken aback, the plaintiff immediately asked why did he have to turn himself in, why are they threatening to come and arrest him? The Bond company explained to the plaintiff, that on September 30, 2011, the defendant revoked his bond and issued a warrant for his arrest because he failed to show up for his arrangement on September 15, 2011. During this phone call the plaintiff was visible shaking he immediately explain that his arrangement was not September 15, 2011, but September 14, 2011, to which he attendant. The bond company responded, that was not the case, the plaintiff was placed on the court docket on September

15, 2011, and if he was not at their Long Beach Office at 0700 in the morning, they were coming to his home to arrest him. So, the very next morning on October 6, 2011, the plaintiff was at the bail bond's office which was directly across from the courthouse. The bond company began to question him as to why he did not show up for his schedule court appearance on September 15, 2011. Because his release on bond was a conditioned that he appeared for that arraignment and with his failure to appear he was likely going to jail. At this point, the plaintiff explained to the bond company, he did show up for that arrangement, in fact, the reason he showed up on September 14, 2011, and not the 15th, was based on the Statement of Charges the bond company provided him. In Addition, the plaintiff further explained, when he appeared for that arrangement on September 14, 2011, his name was never called.

And it was further explained to the plaintiff that the prosecutor had not filed the charges at that time, and he had to wait for the prosecutor to determine if they were going to file charges or not. Then the plaintiff provided the bond company with the statement of charges, the very documentation they gave the plaintiff, which showed the appearance date, time, and location. Furthermore, the plaintiff provided the bond company with the proof of attendance, which the defendant provided the plaintiff dated September 14, 2011, at 2:00pm, which states no case filed at this time. With the look of bewilderment, and no apology for the threat of physically coming to his home and restraining him, depriving him of his liberty. The plaintiff was instructed to go across the street and explain his situation to the defendant to have them remove the warrant.

The plaintiff promptly went to the defendant where he was instructed to attend a bench warrant hearing. On October 6, 2011, that same morning, he attended the bench warrant hearing, during that hearing the plaintiff provided to the presiding judge the same reasoning he did to the bond company, that he indeed appeared for his arrangement, and provided the statement of charges and proof of attendance. After the judge reviewed the documentation, the bench warrant was rescinded, the plaintiff's bond was reinstated, and he was rescheduled for a new arrangement date which was October 20, 2011. On October 20, 2011, the plaintiff was back at court, and this time his name was called. At which point he was instructed to report to the Public Defender's Office, once he was appointed counsel to

come back and wait for him to be called again. The plaintiff was appointed counsel, his name was recalled, at which time, the plaintiff plead no contest to the September 2, 2011, DUI. The judge accepted his plea and asked the plaintiff if there was any reason he could not be sentenced at that time, the plaintiff replied no, he was sentenced. The major aspects of sentencing that was imposed on the plaintiff by court order.

The judge sentenced him to three years of probation and (1) payment of various fines or service of 13 days in jail; or, in lieu of certain of those fines, performance of community service; (2) payment of court costs of $120.00; (3) enrollment in a 3-month alcohol education and counseling program; (4) payment of restitution in the amount of $100.00; (5) payment of $129.00 in attorney's fees pursuant to Penal Code 987.8; and (6) payment of $129.00 in booking fees. Over the next several years the plaintiff complied with all aspects of the judge's order with the exception of the court security fee and the restitution fine. The plaintiff failed to pay the court security fee and a restitution fine, so on October 31, 2012, a year later, the court clerk sent a delinquency notice with a hearing date of December 7, 2012.

After the sentencing was complete, the plaintiff went back to the Public Defender's Office where he met with a court appointed financial officer, and it was determined that the plaintiff did not have the financial means, at that time, to pay for his legal assistance fees which included the $129.00 in attorney's fees pursuant to Penal Code 987.8; and he was granted a fee waiver for those legal fees. To make clear, the plaintiff is asserting that the cause of action is that the defendant failed to terminate the plaintiff's criminal case which was a clerical error based on a debt the plaintiff did not owe. After the plaintiff spoke to the court clerk supervisor, he began an investigation as to how and why his criminal proceeding was never terminated and what did the $159 consist of. During that investigation the plaintiff discovered several other Constitutional and Statutory violations committed by the court clerk.

For example, as stated above, the court clerk never promptly indexed the criminal information filed by the prosecutor allowing the court system to show that the plaintiff's case was not file. So, when a different clerk check the system on September 14, 2011, the plaintiff was misled into thinking no case was filed and because no cases were to be

accepted after 2pm, which was the daily cutoff time, the plaintiff with proof of appearance stating as of 2pm no case was file, so the plaintiff left the courthouse. However, a different court clerk saw that the plaintiff's criminal information which had been filed by the prosecutor but never indexed and placed on the court's calendar, at which time, that clerk index the information and placed it on the afternoon calendar approximately 3pm on September 14, 2011, almost an hour after the plaintiff had left the court.

So, the judge based on his court calendar called the plaintiff's name in open court, because the plaintiff was told no case was filed, he had left for the day, meaning, no response from the plaintiff, meaning, he failed to appear, and an FTA notice was issued, and that is how the plaintiff end up being contacted by the bond company. Next, as stated above, on October 20, 2011, the plaintiff was provided a fee waiver for his legal assistance fees, which included the attorney's fee order pursuant to section 987.8(a). This is where the clerical error manifested itself, the $159 was based on the attorney's fee, within the plaintiff's administrative record the judge order the plaintiff to pay $129 in attorney's fee, the $30 would appear to be a late fee and the plaintiff's case file was sent to collections for failure to pay the attorney's fee.

Based on the clerical error, the failure of the court clerk to properly index the plaintiff's criminal information and failing to provide notice of his case file being sent to collection, the plaintiff filed suit. *Woods v Superior Court of California, County of Los Angeles et.,* 20LBCV00525. The defendant demurred on three affirmative defenses, (1) Sovereign Immunity, (2) Quasi-Judicial Immunity, and (3) Statute of Limitations. The trial court sustained the demurrer on the grounds of quasi-judicial immunity. Specifically, the plaintiff's allegations of court clerk's failure to perform a mandatory ministerial function by failing to place his criminal information on the court index after the county attorney filed charges in September 2011, and by the court clerk sending plaintiff's file to collection for a second time without notice or a determination of plaintiff's ability to pay for attorney fees.

Those two substantive allegations of wrongdoing are the clerk's failure to properly index the county attorney's DUI charge against plaintiff, and the clerk's failure to give plaintiff notice re non-payment of his outstanding fees. Those actions are attributable to the clerk itself, and these actions constitute either a ministerial function part of the judicial

process, or a function judicial in nature, and thus the clerk, and by extension, the court, are immune. In addition to the quasi-judicial immunity, the trial court also stated that the statute of limitation attached, because based upon the October 20, 2011, court hearing minute order from plaintiff's DUI case, (which you, Judge Vicencia, presided over) plaintiff was on notice that he had to pay certain fines and restitution resultant from his DUI.

Plaintiff was present in court, pleaded no contest, and the court ordered him to pay: a fine of $390; state penalty fund assessment of $924; a $66 criminal fine surcharge; $50 alcohol abuse assessment; $120 in court costs; $100 in restitution; and other miscellaneous charges, totaling $1789. As Court argues, had plaintiff simply reviewed the minute order, he would be on notice of the amount due, and consequently would be on notice of the outstanding amount each time he paid a portion of the fines. Lastly, the trial court sustained the demurrer on the grounds that the plaintiff failure to allege facts to constitute causes of action. Plaintiff does not, and cannot, allege that had the clerk properly indexed his charge, he would not have faced his DUI charge.

Plaintiff alleges no damages resultant from that act. The demurrer to the FAC is sustained without leave to amend. Defendant is ordered to give notice. But where the trial court errored was he never opined as to the clerical error which was the primary cause of action. When plaintiff was preparing for oral arguments at the appellate court, it came to his attention why the trial court never applied any legal principle to the issue of fact, which was the clerical error. Defense counsel never placed within its demurrer a challenge to the clerical error, and because they failed to bring that issue before the trial court, there was no final judgment on the merits of the clerical error. So, with no legal principle being applied to that issue, the plaintiff is not precluded from submitting the legal issue to this Court to litigate the issue that was never raised or litigated by the trial court. *Cromwell* v. *County of Sac*, 94 U. S. 351, 352. The trial court never ruled on the merits of the clerical error which should escape the doctrine of res judicata. "Res judicata" describes the preclusive effect of a final judgment on the merits. Res judicata, or claim preclusion, prevents relitigation of the same cause of action in a second suit between the same parties or parties in privity with them. Collateral estoppel, or issue preclusion, "precludes relitigation of issues argued and decided in prior proceedings." (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341, 272

Cal.Rptr. 767, 795 P.2d 1223.) 438*438 Under the doctrine of res judicata, if a plaintiff prevails in an action, the cause is merged into the judgment and may not be asserted in a subsequent lawsuit; a judgment for the defendant serves as a bar to further litigation of the same cause of action. A clear and predictable res judicata doctrine promotes judicial economy. Under this doctrine, all claims based on the same cause of action must be decided in a single suit; if not brought initially, they may not be raised at a later date.

"`Res judicata precludes piecemeal litigation by splitting a single cause of action or relitigation of the same cause of action on a different legal theory or for different relief.'" (*Weikel v. TCW Realty Fund II Holding Co.* (1997) 55 Cal.App.4th 1234, 1245, 65 Cal.Rptr.2d 25.) A predictable doctrine of res judicata benefits both the parties and the courts because it "seeks to curtail multiple litigation causing vexation and expense to the *parties* and wasted effort and expense in *judicial administration*." (7 Witkin, Cal. Procedure (4th ed. 1997) Judgment, § 280, p. 820.)

## V. LEGAL ARGUMENT

The plaintiff believes he did not receive a full and fair hearing, he was never afforded an opportunity to fully litigate his claim in the State Court. Although several issues were litigated, the primary cause of action, which was the clerical error was not. To make clear, the plaintiff is in no way trying to circumvent the legal system by initiating this petition with this Court, the plaintiff is not a sore loser, nor is he looking to receive a move favorable outcome at the expense of the trial court. The trial court errored, to no fault of its own, but at the hands of defense counsel, the plaintiff should not be denied his second bite at the legal apple on a error he did not commit. The plaintiff is looking for a full and fair hearing, meaning, for his petition to be heard on its merits as to the legal issue of fact, the clerical error, and not to be deprived of a full and fair hearing on a technical legal error committed by the trial court.

### i. 42 U.S.C. Section § 1983

Elements of a § 1983 Action: The courts have required plaintiffs to "plead two and only two causes of actions: (1) the defendants acting under color of state law (2) deprived plaintiffs of rights secured by the Constitution or federal statutes." *Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986). "[M]unicipalities and other local government units . . .

[are] among those persons to whom § 1983 applies." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). Counties are also persons for purposes of § 1983. *See Jackson v. Barnes*, 749 F.3d 755, 764 (9th Cir. 2015) ("[W]hen a California sheriff's department performs the function of conducting criminal investigations, it is a county actor subject to suit under § 1983"), *cert. denied*, 135 S. Ct. 980 (2015); *Miranda v. Clark Cty., Nev.*, 319 F.3d 465, 469 (9th Cir. 2003) (en banc). Municipal government officials are also persons for purposes of § 1983. *See Monell*, 436 U.S. at 691 n.55.

When the court clerk committed the clerical error, that error met the first element of section § 1983, meaning, they were acting under color of state law which was to issue all process and notices required by law to be issued (Gov. Code, § 69843. Where they "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). That clerical error also met the second element of section § 1983, meaning, by the court clerk failing to record the plaintiff's termination of his criminal proceedings, which was a mandatory duty secured by federal statute Government Code section 815.6. In addition, to depriving the plaintiff of his procedural due process rights secured by the Constitution.

### ii. *Failure to Provide Notice*

As stated above, the plaintiff was awarded a fee waiver for his legal assistance fees which included the attorney's fee pursuant to section 987.8(a). In addition, pursuant to section 987.8(b), the defendant had within his discretion, within six-months of the conclusion of his criminal proceedings, whether the plaintiff's ability to pay the legal assistance fees had changed. Section 987.8(b). If a defendant is provided legal assistance, either through the public defender or private counsel appointed by the court, upon conclusion of the criminal proceedings in the trial court or upon the withdrawal of the public defender or appointed private counsel, the court may, *after notice and a hearing*, make a determination of the present ability of the defendant to pay all or a portion of the cost thereof. The court may, in its discretion, hold one such additional hearing within six months of the conclusion of the criminal proceedings. The court may, in its discretion, order the defendant to appear before a county officer designated by the court to make an inquiry into

- 8 -

the ability of the defendant to pay all or a portion of the legal assistance provided. And on December 30, 2011, two months after the plaintiff's criminal proceedings was terminated, the defendant decided to exercise its discretion to reassess plaintiff's ability to pay attorney's fee. As the statute dictates, on December 30, 2011, the defendant sent plaintiff case file to a county officer designated by the court to make an inquiry into the ability of the plaintiff to pay the attorney's fee for the legal assistance provided. Which was the first violation of the statute, the plaintiff was never placed on notice, or to use the words of the statute "order by the defendant to appear," that the defendant decided to use its discretion to reassess his ability to pay the fees that were waived.

As the statute clearly states, *after notice and a hearing*, meaning both needed to occur to trigger the defendant's justification for initiating it discretion to reassess the plaintiff's ability to pay all or a portion of the cost thereof. To address the obvious, it is undisputed that the court clerk's responsibility is to issue all notices. The Court Clerk Duties Section 69898 are described as follows: to issue all process and notices required by law to be issued (Gov. Code, § 69843). In addition, the plaintiff believes the discretion the statute speak to, is not the discretion absolute judicial immunity speaks to, as a judicial act, or as an integral part of the judicial process. The plaintiff believes this assertion has support within the law, if the court clerk was directed to issue notice for reassessment as to the defendant's asserting its discretion, the clerk was acting, not as a quasi-judicial officer, but in the capacity of an administrator of the court.

Meaning, that failure of issuing notice was not an integral part of the judicial process. Although section 987.8(b) spoke of notice by "the court" this does not imply giving the notice was a judicial act or that it could only be performed by a judge. On the contrary, Government Code section 69843 provides, "The clerk of the superior court shall issue all process and notices required to be issued." The superior court clerk is a county employee. (Cal. Const., art. VI, § 4.) (6a) The mere fact the clerk performs duties for a court does not clothe the clerk with judicial immunity. (*Lick* v. *Madden* (1868) 36 Cal. 208, 213.) The question whether the court clerk is immune from liability under the doctrine of judicial immunity depends not on his or her status as a clerk of court but on the nature of the act involved. (See, Annot., *Applicability of Judicial Immunity to Acts of Clerk of Court Under*

*State Law,* (1984) 34 A.L.R.4th 1186, 1189 and cases cited therein.) The plaintiff was denied his right to be present at an official hearing, a hearing that sought to deprive him of his property, which was mandatory and a clear violation of his procedural due process rights.

### *iii. Clerical Error Committed By The Court Clerk*

In addition to not notifying the plaintiff, the county officer held the hearing despite the plaintiff not being present, denying him the ability to object, defend, or apology. The touchstone of due process is protection of the individual against arbitrary action of government. Further arbitrary action, the outcome of that hearing was averse to the plaintiff. Specifically, the determination of the hearing was that the plaintiff had the ability, at that time, to pay the attorney's fee. This decision was done without the benefit of the plaintiff providing any financial information to support or reject that decision. But what was graver, was not the fact the decision was made to deprive the plaintiff of his property without notice, but the fact the court clerk failed to record the adjudication of the plaintiff's conviction pursuant to Vehicle Code Section 23152(b), mandated by Gov. Code, § 69843.

"The duties of clerks are in general to serve the court in a ministerial capacity, to act as custodians of its records and to perform such duties as are prescribed by law or imposed by the lawful authority of the court." (*Union Bk. & Tr. Co.* v. *Los Angeles Co., supra,* 2 Cal. App.2d 600, 609; see Gov. Code, § 69841 et seq.) Among these duties the clerk shall issue all adoption proceedings and notices required to be issued. (Gov. Code, § 69843; see *Touchard* v. *Crow, supra,* 20 Cal. 150, 158.) It is undisputed that the court clerk had a responsibility under the law to record the plaintiff's criminal proceedings. The question that is before this Court is whether that failure to record a criminal proceeding, that had been properly adjudicated, was the clerical error an integral part of the judicial process and therefor warrants immunity? The plaintiff believes that the clerical error was not an integral part of the judicial process based solely on the nature of the error itself, and the answer to the question posed should be answered in the negative.

Here is why, the plaintiff further believes that the court clerk was not acting as a quasi-judicial officer when they committed the error. The court clerk wears two hats, (1) As a quasi-judicial officer when conducting the business of the judge, or an integral part of the

judicial process. (2) As an administrator of the court, when conducting business for the court, its one or the other, and not at the same time. The duties of clerks are in general to serve the court in a ministerial capacity, to act as custodians of its records and to perform such duties as are prescribed by law or imposed by the lawful authority of the court." (*Union Bk. & Tr. Co. v. Los Angeles Co., supra,* 2 Cal. App.2d 600, 609; see Gov. Code, § 69841 et seq.) The court clerk was merely performing its normal function or the failure thereto when they were to record within the court system that the plaintiff's criminal proceedings was terminated which is by statute an ministerial act. Ministerial acts, such as properly filing court papers, *See McCray v. Maryland,* 456 F.2d 1, 4 (4th Cir. 1972) require no discretion or judgment. *See, e.g., Perkins v. United States Fidelity & Guar. Co.,* 433 F.2d 1303, 1305 (5th Cir. 1970) (per curiam); 11 Ind. L. Rev. 489, 498-99 (1978).

The pronouncement or rendition of a judgment, for example, is a judicial act, while the entry thereof is merely ministerial. Thus, lack of immunity for such acts poses no threat to the decision-making process. Furthermore, the mere fact the clerk performs duties for a court does not clothe the clerk with judicial immunity. (*Lick v. Madden* (1868) 36 Cal. 208, 213.) (4b), (6b). The question whether the court clerk is immune from liability under the doctrine of judicial immunity depends not on his or her status as a clerk of court but on the nature of the act involved. (See, Annot., *Applicability of Judicial Immunity to Acts of Clerk of Court Under State Law,* (1984) 34 A.L.R.4th 1186, 1189 and cases cited therein.) The nature of the act involved is failing to record the termination of a criminal proceedings. As stated above, the mere fact the court clerk's duty is to issue all process and notices required to be issued. Gov. Code, § 69843 does not automatically clothe the clerk with judicial immunity.

The clerical error was in no way an integral part of the judicial process because it involved no judicial discretion. While administrative, legislative, or executive acts require varying degrees of discretion, it is not judicial discretion merely because the actor is a quasi-judicial officer, and that discretion does not bear on the independent decision-making in the adjudication process. *See Imbler v. Pachtman,* 424 U.S. 409, 430-31 (1976); *Richardson v. Koshiba,* 693 F.2d 911, 914 (9th Cir. 1982). Lastly, the clerical error did bear on the independent decision-making in the adjudication process based on who and how the error

Woods v. Superior Court of California, County of Los Angeles

was corrected. For example, the court clerk supervisor was the one who corrected the error, and the form provided to the plaintiff should be evident that the error was purely ministerial in nature and not judicial in nature. The plaintiff was provided the Clerk of Court Notice of Clerical Error and Correction, the form in-and-of itself rules out the clerical error being an integral part of the judicial process. The distinction between clerical error and judicial error is "whether the error was made in rendering the judgment, or in recording the judgment rendered." (46 Am.Jur.2d, Judgments, § 202.) Any attempt by a court, under the guise of correcting clerical error, to "revise its deliberately exercised judicial discretion" is not permitted. *In re Wimbs* (1966) 65 Cal.2d 490, 498 [55 Cal. Rptr. 222, 421 P.2d 70].)

So, it should logically follow that if the court clerk supervisor corrected the clerical error, there was no deliberate exercise of judicial discretion. In short, the doctrine of judicial immunity is meant to protect only judicial acts, *See Stump v. Sparkman*, 435 U.S. 349, 365 (1978) (Stewart, J., dissenting) (citing *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 347, 348, 349, 351, 354, 357 (1872)). Which, by definition, are acts requiring judicial discretion. *See* Block, *supra* note 41, at 920-21; Wilson, *supra* note 4, at 809-10, 11 Ind. L Rev. 489, 498 (1978); *cf.* Harlow v. Fitzgerald, 457 U.S. 800, 810-11 (1982) (judges absolutely immune only when performing acts judicial in nature, but not for other official acts). See *supra* notes 42-4 *See* Block, *supra* note 41, at 920-21; Wilson, *supra* note 4, at 809-10, 11 Ind. L Rev. 489, 498 (1978). The clerical error as a cause of action should not be barred based on quasi-judicial immunity.

### *iv. Defamation Per Quod*

Mr. Woods is claiming that the Superior Court of California, County of Los Angeles harmed him by making one of the following statements: Mr. Woods willfully avoided accountability and failed to be properly adjudicated for his violation of Vehicle Code Section 23152, on October 20, 2011.

1. The Superior Court of California, County of Los Angeles made a spoken or written statement to persons other than Mr. Woods. 2. These people reasonably understood that the statement was about Mr. Woods. 3. That because of the facts and circumstances known to the listeners/readers of the statement, they tended to injure Mr. Woods in his occupation or to expose him to hatred, contempt, ridicule, or shame or to discourage others from

associating or dealing with him. 4. The Superior Court of California, County of Los Angeles failed to use reasonable care to determine the truth or falsity of the statement. 5. That Mr. Woods suffered harm to his profession, or occupation including money lost because of the statement; and 6. That the statement was a substantial factor in causing Mr. Woods's harm.

On October 20, 2011, Mr. Woods plead nolo contendere to Vehicle Code Section 23152(b), at which time he was arraigned, convicted, and sentenced. Once Mr. Woods's criminal proceedings was concluded he left the courthouse. The court clerk failed to record into the court system that his criminal proceedings was terminated. And as argued above, it would appear that failure, was due to Mr. Woods being reassessed as to his ability to pay the attorney's fee order by the judge, which he received a fee waiver for. But the Superior Court of California had within its discretion one last bite at the apple within a six-month period to determine if Mr. Woods could replenish the court's coffers for the legal assistance fees he was provided, which they decided to exercise.

In exercising that decision, the Superior Court of California determined that Mr. Woods had the ability, at that time, to pay his legal assistance fees, but failed to inform him of that decision. In addition, the Superior Court of California, County of Los Angeles based on a debt did not terminate his criminal proceedings to what can only be surmised as a collection tactic, in order to collect the debt at some future time. Because the failure to terminate was not based on the guilty plea, which was accepted by the judge, but based on a failure to pay legal assistance fees. How did this failure harm Mr. Woods? After his three-year informal probation was up, he began applying for jobs within the law enforcement community and with every application submitted, test taking, physical agility past, background packet submitted, Mr. Woods was rejected due to him being unsuitable for the position.

The first and most traumatizing one was processing with Border and Custom. Mr. Woods spent a year going through the hiring process, eleven-months in, after taking the medical exam, the panel interview, Mr. Woods was provided the packet for the polygraph, which he completed and submitted. After two days, it was determined that Mr. Woods had passed the polygraph portion of the process and was given the criminal background packet,

which he completed and submitted. Thirty days later, Mr. Woods received a letter stating that employment was not suitable. This was the final straw with the law enforcement side, at which time, Mr. Woods decide to go the law school, but prior to law school he received his certification to become a paralegal. During his paralegal program Mr. Woods needed to complete an internship, and he applied for the internship at the Riverside County District Attorney's Office. On June 16, 2020, the plaintiff submitted a SF-86 background packet and conducted a live scan to participate in a paralegal internship with Several weeks later, on July 10, 2020, Mr. Woods received an email from his professor, the Internship Coordinator, explaining she did not have all the particulars, but she was told that Mr. Woods did not pass the criminal background check. And since Mr. Woods did not pass the background, the Riverside County District Attorney's Office cannot allow him to participate in the internship.

Nevertheless, not fully comprehending how he could have failed the criminal background, his professor provided him with the email to Ms. Pina the Human Resources and Facilities Management at the Riverside County District Attorney's Office. On July 10, 2020, Mr. Woods contacted Ms. Pina where she stated she could not provide him with the reason why he failed, just the fact he did fail. That did not sit well with Mr. Woods, and over several weeks of emails, he finally asked to speak to her supervisor, several weeks later, on July 20, 2020, he received a phone call from Mr. Haringsma an Assistant District Attorney. During their conversation Mr. Haringsma explained that he and the investigator reviewed Mr. Woods's file, and although Mr. Haringsma could not explain to him the reason for not passing the background.

Mr. Haringsma went on to explain his rationale for not clearing Mr. Woods for the internship was based on a discrepancy within his criminal background, which disqualified him for the internship at that time. Although Mr. Woods disagreed with the decision, he excepted it. In addition, on July 31, 2020, Mr. Woods was instructed by his professor to apply for an internship with the San Bernardino Public Defender's office, at which time they too, initiated a background investigation. And on August 11, 2020, Mr. Woods received a phone call from Attorney Smith from the Public Defender's office, where he asked Mr. Woods if he had taken care of his 2011 DUI in Long Beach. Taken aback, Mr. Woods

replied yes, he completed all mandatory requirements, fines, fees, and completed his 3-year probation term. Mr. Woods went on to say he had not had any contact with the defendant since 2013. Mr. Smith responded, the investigator has informed him that the DUI from 2011 was showing unadjudicated, in further disbelief, Mr. Woods responded, that had to be a serious mistake. Because he had all the documentation attesting and affirming that DUI should not be showing unadjudicated.

At which point, Mr. Smith advised Mr. Woods to contact the defendant to get a current confirmation affirming the DUI is in fact not open. So, on August 11, 2020, the same day, Mr. Woods called and spoke with the court clerk of the criminal division. Where he explained to the clerk that he was in the midst of a background investigation with the San Bernardino Public Defender's office, and it was brought to his attention that his DUI from 2011 was still showing as unadjudicated, and that had to be some type of grave mistake. After supplying the clerk with his case number, the clerk replied, no it is not a mistake, the investigator was correct, Mr. Woods's DUI is showing unadjudicated because he owes a fine of $159. At this point, Mr. Woods and the court clerk get into a back-an-forth as to how he still owed any money to the defendant.

Why over this nine-year time-period he was never notified as to the debt, or that his criminal proceeding was never terminated? At which time his argument shifted to what did the $159 consist of? The clerk explained that she would need to retrieve his file, however, because of the time of the day, it would not be until the next morning, which was Wednesday August 12, 2020. After that phone call Mr. Woods emailed his professor and update her on the status of his internship with the Public Defender's office. Then he also called Mr. Smith back and explain that his DUI was in fact showing as unadjudicated as the investigator indicated, because he owed $159 to the court. Mr. Woods further explained to Mr. Smith that he would go to the courthouse in the morning to pay the money to close his case, so that he could complete the background check to begin the internship.

On the morning of August 12, 2020, while Mr. Woods was on his way to the courthouse, he received a phone call from Ms. Adams the court clerk supervisor, where she explained to Mr. Woods that after a thorough review of his case file, he did not owe the court a $159, in fact, he did not owe any money. Ms. Adams went on to state, that there was

some type of computation error made by the computer which generated the $159 amount, which was a clerical error. Mr. Woods explained to Ms. Adams due to his background investigation he would need written documentation affirming the information she just explained. Later that day Ms. Adams emailed Mr. Woods a Clerk of Court Notice of Clerical Error and Correction, along with the minute order of his case file.

At which time, Mr. Woods contacted the Public Defender's office to explain that it was a clerical error, not anything that the Mr. Woods, himself had done, and he had documentation attesting to that fact. However, it was explained to Mr. Woods that due to the DUI being open at the time of the investigation, he was not suitable for the internship with the San Bernardino Public Defender's office. Dishearten, Mr. Woods thanked Mr. Smith, because he was the first person over the nine-year timeframe to communicate to him what had been making him unsuitable for all law enforcement opportunities. What is significant, is over that six-year period Mr. Woods believed law enforcement to be racist, because they were not hiring him because he was black. To be clear, Mr. Woods is not blaming the agencies, there are not racist, this is squarely at the feet of the defendant.

But it all makes sense now, that the defendant's clerical error of allowing Mr. Woods's criminal case to continue to show as unadjudicated was preventing him from becoming employed with those law enforcement agencies. It can only be surmised that their investigators also saw Mr. Woods's 2011 DUI still open. The problem with not expressing that discrepancy to Mr. Woods allowed him to think he was suitable for law enforcement and continued to apply for those opportunities. When in fact, he was not suitable, and that lack of information prevented Mr. Woods from confronting the unsuitability sooner. Because what law enforcement agencies look for when conducting a background check, they look to see if the applicant is truthful.

So, with Mr. Woods claiming there is nothing in his background that would prevent him from becoming a police office, and it turns out his 2011 DUI is still open, makes the him looks untrustworthy. Which creates the appearance that the Mr. Woods is a liar, and that is the one trait you do not want to have questioned when attempting to go into law enforcement. And it all makes sense now, why Mr. Woods was found unsuitable every time it came to his criminal background within the law enforcement community. And it should be

undisputed that the court clerk's failure to record the termination of Mr. Woods's criminal proceedings was the wrongful conduct that was a substantial factor in causing him harm to his reputation; and shame, mortification, and hurt feelings.

#### v. Sovereign Immunity

The defendant is among those persons to whom section § 1983 applies." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), so, the plaintiff's petition should not be barred by Sovereign Immunity afforded to the State. The [E]leventh [A]mendment does not bar suits under section § 1983 actions against cities and counties." *Greater L.A. Council on Deafness, Inc. v. Zolin*, 812 F.2d 1103, 1110 (9th Cir. 1987); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.54 (1978). Counties are also persons for purposes of § 1983. *See Jackson v. Barnes*, 749 F.3d 755, 764 (9th Cir. 2015) ("[W]hen a California sheriff's department performs the function of conducting criminal investigations, it is a county actor subject to suit under § 1983"), *cert. denied*, 135 S. Ct. 980 (2015); *Miranda v. Clark Cty., Nev.*, 319 F.3d 465, 469 (9th Cir. 2003) (en banc). "[M]unicipalities and other local government units . . . [are] among those persons to whom § 1983 applies." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).

The Eleventh Amendment does not bar suits seeking damages against state officials in their personal capacity. *See Hafer v. Melo*, 502 U.S. 21, 30-31 (1991). The party asserting Eleventh Amendment immunity bears the burden of proof. *See Del Campo v. Kennedy*, 517 F.3d 1070, 1075 (9th Cir. 2008). State officials sued in their personal capacity are persons for purposes of § 1983. *See Hafer v. Melo*, 502 U.S. 21, 31 (1991); *Porter v. Jones*, 319 F.3d 483, 491 (9th Cir. 2003); *DeNieva v. Reyes*, 966 F.2d 480, 483 (9th Cir. 1992). "Personal-capacity suits seek to impose personal liability upon a government official for actions [the official] takes under color of state law." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Liability in a personal-capacity suit can be demonstrated by showing that the official caused the alleged constitutional injury. *See id.* at 166.

#### vi. Absolute Quasi-Judicial Immunity

Judicial immunity extends "to persons other than judges if those persons act in a judicial or quasi-judicial capacity." (*Howard v. Drapkin, supra*, 222 Cal.App.3d at pp. 852-853.) As pertinent here, that immunity extends to court clerks performing purely

administrative duties that are part of the judicial process. (*In re Castillo* (9th Cir. 2002) 297 F.3d 940, 952; *Rodriguez v. Weprin* (2d Cir. 1997) 116 F.3d 62; *Mullis v. U.S. Bankruptcy Court for Dist. of Nevada* (9th Cir. 1987) 828 F.2d 1385, 1390 ["[c]ourt clerks have absolute quasi-judicial immunity from damages for civil rights violations when they perform tasks that are an integral part of the judicial process"]; *Castillo*, at p. 1273 ["court personnel are immune from administrative tasks if these tasks are 'judicial in nature and an integral part of the judicial process' "].) "[A]bsolute judicial immunity extends not only to claims for damages but to actions for equitable relief as well." (*Twin Sisters Gun Club v. Emlen* (E.D. Cal., Mar. 15, 2018, No. 2:17-cv-01526- MCE-GGH) 2018 U.S. Dist. Lexis 43030, at pp. *25-26.)

The question before this Court is whether the court clerk's failure to record the termination of the plaintiff's criminal proceedings, was an administrative task that was judicial in nature and an integral part of the judicial process? As has been argued above, that question should be answered in the negative, because a clerical error is to be distinguished from judicial error which cannot be corrected by amendment. The distinction between clerical error and judicial error is "whether the error was made in rendering the judgment, or in recording the judgment rendered." (46 Am.Jur.2d, Judgments, § 202.) Any attempt by a court, under the guise of correcting clerical error, to "revise its deliberately exercised judicial discretion" is not permitted. *In re Wimbs* (1966) 65 Cal.2d 490, 498 [55 Cal. Rptr. 222, 421 P.2d 70].)

Because the failure to record the termination was a ministerial act, it was not at the direction of a judge, it did not require judicial discretion, it was mandatory by statute, which should logically follow that act was not judicial in nature and an integral part of the judicial process.

### *vii. Statute of Limitation*

The statute of limitations for violation of 42 U.S.C. section 1983 is determined by state law. (*Wallace v. Kato* (2007) 549 U.S. 384, 387.) For civil rights actions, courts apply the forum state's statute of limitations for personal injury actions. (*Jones v. Blanas*, (9th Cir. 2004) 393 F.3d 918, 927.) In California, the statute of limitations for personal injury actions

is two years. (Code Civ. Proc. § 335.1.) The statute of limitations for violation of statute is three years. (Code Civ. Proc., § 338(a).)

The plaintiff's petition is pushing the California statute of limitations of two years for personal injury action but is well within the three-year statute of limitations for violation of a statute. Nonetheless, the plaintiff believes his cause of action did not accrue until August 12, 2020, when the court clerk supervisor acknowledged and corrected the clerical error committed by the court clerk. As argued above, the plaintiff had no idea as to the court clerk failing to record his criminal proceedings as unadjudicated until August 11, 2020. If plaintiff had chosen a different profession outside law enforcement, it would have never come to his attention that the defendant never terminated his criminal proceedings. If that was the case, it could be argued that up and until today, the defendant would still be showing the plaintiff's criminal proceedings as unadjudicated

It could be a counterargument that every denial based on the plaintiff's being unsuitable due to his criminal background could have triggered the statue to begin running. But that argument should fail for the simple reason, the plaintiff had no suspicion of wrongdoing. The law enforcement agencies were under no legal statute to inform the plaintiff as to their reason of finding him unsuitable, it was clearly within their discretion as noted by the Riverside District Attorney's Office. However, once the plaintiff spoke to the defendant, and was told of his criminal proceedings not being terminated due to a debt, that is when the plaintiff became suspicious of wrongdoing. And when it was discovered the failure to terminate was due to a clerical error, therefore, the plaintiff had an incentive to sue, he decided to file his suit, and did not sit on his rights, or wait for the facts to find him, he went and found the facts." (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1111, 245 Cal. 17*17 Rptr. 658, 751 P.2d 923 (Jolly).

### VI. REQUEST FOR RELIEF

The defendant has already corrected the clerical error; however, they haven't restored the plaintiff's good name, nor the damage to his reputation. The plaintiff would like to recover compensation for the defendant's damage to the plaintiff's reputation and dignity, the loss of his legal right to work within his filed of chose, emotional distress. Taken the totality of the defendant gross negligence over a six-year period and their grave procedural

errors, which severely damaged the plaintiff. The plaintiff is using six-years instead of nine, due to the three-year probation, so, the plaintiff believe a sum certain in the amount of at least six million dollar (6,000,000), a million dollars for every year for the plaintiff's inability to become employed within law enforcement, he believes that would be an aqueduct settlement.

*[signature]*

Byron O Woods Sr.

4/21/22
Date